UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT COVINGTON

CIVIL ACTION NO. 13-49-DLB-CJS

JOHN HUGHES                                                                              PLAINTIFF

vs.                              <u>MEMORANDUM OPINION AND ORDER</u>

CAMPBELL COUNTY, KENTUCKY, et al.                                    DEFENDANTS

*********************

## I.     Introduction

Plaintiff John Hughes brings this civil rights action pursuant to 42 U.S.C. § 1983 against Defendants Heather Vasser, Aimee Paire and Southern Health Partners, Inc. ("SHP"), alleging that he was denied adequate medical care while imprisoned at the Campbell County Detention Center ("CCDC") in January 2013.  Hughes also brings state law claims for negligence and failure to comply with 501 KAR 3:090, which governs the provision of medical services to inmates in Kentucky jails.

Discovery is complete and Defendants now move for summary judgment on all claims against them.  Defendants contend that the § 1983 claims fail because Hughes is unable to show that Nurse Vasser or Nurse Paire acted with deliberate indifference towards his serious medical needs.  Defendants also argue that the negligence claims are time-barred, while the regulatory claim is unsupported by the evidence.  For the reasons discussed below, Defendants' motion will be granted in full.  The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1367(a).

1

## II.     Factual and Procedural Background

### A.     The Parties

Defendant SHP is a Delaware corporation that provides medical services to small and medium sized detention centers across the country.  (Doc. # 50-1 at 2).  In accordance with 501 KAR 3:090,[1] the CCDC contracted with SHP to provide healthcare services to its inmate population.  (*Id.*)  At all times relevant to this matter, Defendants Heather Vasser and Aimee Paire worked as nurses for SHP.  (*Id.* at 3).  Their duties included managing sick call, dispensing medications and otherwise attending to the prisoners' healthcare needs.  (*Id.*)  They reported to the SHP regional administrator, Brenda Brown.  (*Id.*)  For additional dental services, SHP subcontracted with Mid America Health, Inc. ("Mid America"), which arranged for a dentist to visit the CCDC twice a month.  (*Id.*)

Plaintiff John Hughes was booked at the CCDC on March 12, 2012.  (*Id.*)  Within a couple of days, he was transferred from the main jail to the Restricted Custody Center, which is also referred to as "Class D."  (Hughes Deposition, Doc. # 49 at 88-90).  The transfer was necessary so that Hughes could participate in a work program.  (*Id.*)  Throughout his incarceration, Hughes worked five days a week as a member of the road crew.  (*Id.*)  Aside from the incident giving rise to this lawsuit, Hughes requested medical services on only one other occasion, and recalls that the treatment he received was satisfactory.  (*Id.*)

### B.     The Incident

On January 2, 2013, Hughes began experiencing pain in his tooth and assumed that

---

[1] 501 KAR 3:090(1) states that a "jail's medical services shall be provided by contracting with a health care provider licensed in Kentucky."

2

it might be chipped.  (*Id.* at 95).  After two days with no improvement, he completed a "sick call slip" and provided it to a deputy in Class D, expecting that the deputy would pass it along for SHP medical staff to review.  (*Id.* at 100-01).  In the space provided for describing his ailment, Hughes wrote "[I] have a chiped [sic] tooth that is showing the nerve it hurts nonstop and I can't get any sleep.  Please Help ASAP."  (Doc. # 50-8 at 2).  Although Hughes insists he was never seen by Nurse Heather Vasser in connection with this tooth, she signed the sick call slip as evidence of review on January 6, 2013.[2]

Over the next few days, Hughes' tooth continued to bother him and he started to notice minor swelling on his face.  (Doc. # 49 at 120-21).  The pain affected his ability to work, although it is unclear exactly how many days he missed.  Hughes testified that he stopped working completely on January 2, 2013, the first day he noticed something wrong with his tooth.  (*Id.* at 93).  But according to the documents provided by Defendants, Hughes did not miss a scheduled day of work until January 4, 2013, the same day he submitted his first sick call slip.  (*See* Doc. # 50-7 at 2-7).  He resumed working the very next day, and did not miss again until January 9th.  (*Id.*)

---

[2] Despite confirming that it was in fact her signature at the bottom of the sick call slip, Nurse Vasser does not recall providing treatment to Hughes on January 6, 2013, or on any other day for that matter.  (Doc. # 50-8 at 2; Vasser Deposition, Doc. # 48 at 11, 20, 41).  Moreover, she testified that it is customary to fill out a "clinical pathway form" whenever medical treatment is provided to an inmate.  (*See* Doc. # 48 at 11-12).  Although discovery is complete, a clinical pathway form showing that Hughes was treated on January 6th was never produced.  Nonetheless, in their Motion for Summary Judgment, the Defendants insist not only that Nurse Vasser examined Hughes on January 6th, but that she scheduled him for a visit with the dentist.  (Doc. # 50-1 at 4).  Hughes denies being seen by Nurse Vasser, or any other nurse from SHP, until January 10, 2013.  (Doc. # 49 at 102).  Yet the amended complaint states that he "was seen two days after filing the slip by Nurse Vasser and/or Paire."  (Doc. # 23 at 8).  These factual inconsistencies will be handled pursuant to the applicable standard on summary judgment.  *See infra* note 6.

On January 7, 2013, Hughes approached a nurse that was making her daily rounds and asked if the medical staff had reviewed his sick call slip. (Doc. # 49 at 105-06). The unidentified nurse responded that they had not, but said that someone would get to it as soon as possible. (*Id.*) When Hughes asked for some Ibuprofen, the nurse explained that she could not provide him with any medicine until the medical staff had processed his first sick call slip. (*Id.*)

By January 8, 2013, the swelling had spread to Hughes' neck. (*Id.* at 122). Frustrated and still very uncomfortable, he asked a deputy for another sick call slip, which he completed and personally delivered to a nurse on the morning of January 9, 2013. (*Id.* at 107-09). In the space provided for describing his condition, Hughes simply wrote the words "bad tooth," and nothing else. (Doc. # 50-10 at 2). Shortly after submitting the second sick call slip, he was transported to the main jail to see a dentist from Mid America. (Doc. # 49 at 113). The dentist recorded a large abscess in tooth # 32 and noted that Hughes' jaw was "swollen and warm to the touch." (Doc. # 50-11 at 4). An x-ray was not possible because Hughes was unable to open his mouth wide enough. (*Id.*) The dentist administered Ibuprofen and Benadryl for the pain and swelling, and prescribed a course of antibiotics to treat the infection. (*Id.*) Hughes was scheduled to be seen again the next time a dentist visited the CCDC. (*Id.*) The plan was to pull his abscessed tooth once the infection was gone. (Doc. # 49 at 110).

Following his visit with the dentist, Hughes stayed in a holding cell at the main jail for a few hours before being transported back to Class D. (*Id.* at 114-15). He spent the remainder of the afternoon waiting for his antibiotics, but was eventually told that it would

4

take a couple of days before they arrived.[3]  (*Id.*)

On January 10th, Hughes was unable to get out of the bed.  (*Id.* at 117).  The swelling had spread to his chest and he was experiencing difficulty breathing.  (*Id.* at 123).  In the early afternoon, a deputy in Class D noticed his condition and decided to take Hughes back to the main jail so that medical staff could examine him.  (*Id.* at 117).  He was seen first by Nurse Fitzgerald, who took his vitals and administered 600 milligrams of liquid Ibuprofen.  (Doc. # 50-12 at 2).  When Nurse Paire arrived, she noted pronounced swelling on his Hughes' jaw and neck and observed that he could not open his mouth wider than one-half inch.  (Doc. # 50-13 at 3, ¶ 24).  She discussed the situation with Brenda Brown and then decided to call Dr. So, who recommended that Hughes be sent to the hospital immediately.  (*Id.* at 3, ¶ 25).  Nurse Paire complied.  (*Id.*)

At the hospital, Hughes was taken directly into surgery.  (Doc. # 49 at 163).  Though still awake, doctors operated primarily on his neck and performed a tracheotomy to stabilize his breathing.  (*Id.* at 164-65).  The surgery was successful and the tube in Hughes' neck was removed a few days later.  (*Id.* at 165-66).  Hughes stayed at the hospital to recover until January 17, 2013.  (*Id.*)  From there, he returned to the CCDC for one night and was

---

[3] Initially, Hughes testified that he did not receive any additional medical care on January 9th apart from his encounter with the dentist.  (*Id.* at 115).  Upon further questioning, he recalled being taken to the main jail and receiving a topical medication with swabs and liquid Ibuprofen, although he maintains that he is not sure if this occurred on January 9th or on another day.  (*Id.* at 123-24).  Nurse Paire has filed an affidavit stating that she saw Hughes on January 9th and that during their encounter she provided him with several medications, including a topical numbing agent called Lidocaine, which is applied using swabs.  (See Doc. # 50-13 at 2-3, ¶¶ 3-19).  These same facts are documented on a clinical pathway form that was completed by Nurse Paire on January 9, 2013.  (Doc. # 50-14 at 2).  Finally, the progress notes in Hughes' medical file state that he received "Lidocaine and swabs" from Nurse Paire during a visit on the evening of January 9th.  (Doc. # 50-12 at 3).  The progress notes were taken by Nurse Paire.  (*Id.*)  Again, these factual discrepancies will be handled in accordance with the appropriate standard on summary judgment.  *See infra* note 6.

then transferred to the Kentucky State Reformatory on January 18, 2013.  (Doc. # 50-1 at 6-7).

### C.    The Lawsuit

 Hughes filed the instant lawsuit on May 5, 2013.  (Doc. #1).  Originally, he named the following parties as defendants: Campbell County, Kentucky; Jailer Greg Buckler; John and Jane Doe Correctional Officers 1-10; SHP; and John and Jane Doe Medical Staff 1-10. (*Id.*)  Several months later, Hughes filed an amended complaint, replacing John and Jane Doe Medical Staff 1-10 with Nurse Heather Vasser and Nurse Aimee Paire, both of whom were named in their individual capacities.  (Doc. # 23).  On June 24, 2014, the Court entered a Stipulation of Dismissal in which Hughes dropped all claims against Campbell County, Kentucky and Jailer Greg Buckler.  (Doc. # 39).

The remaining defendants are John and Jane Doe Correctional Officers 1-10, Nurse Vasser, Nurse Paire  and SHP.  Each defendant is being sued for 1) alleged violations of 42 U.S.C. § 1983, 2) negligence and 3) failure to comply with 501 KAR 3:090.[4]  (Doc. # 23 at 9-12, ¶¶ 45-65).  On September 30, 2014, Defendants Nurse Vasser, Nurse Paire and SHP filed a Motion for Summary Judgment on all claims brought against them.  (Doc. # 50). In his Response, Hughes concedes that the state law claims are time-barred and that he has no federal cause of action against SHP. (Doc. # 53 at 1).  Accordingly, the focus of this Memorandum Opinion and Order will be on the remaining  § 1983 claims against Nurse Vasser and Nurse Paire.

---

[4] 501 KAR 3:090 includes numerous subsections describing the practices and procedures that a health care provider must follow when treating the inmate population at a Kentucky jail.  In his complaint, Hughes does not indicate which particular subsection Defendants allegedly violated. (*See* Doc. # 23).

### III.    Analysis

### A.    Standard of Review

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  If there is a dispute over facts that might affect the outcome of the case, then entry of summary judgment is precluded.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Id.* at 251-52.  The moving party has the initial burden of demonstrating that there is no evidence to support the non-moving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Once the movant has met its burden, the non-movant must cite to evidence in the record upon which "a reasonable jury could return a verdict" in its favor; a mere "scintilla of evidence" will not do.  *Anderson*, 477 U.S. at 248-52.

On summary judgment, courts view all evidence and draw all inferences in favor of the nonmoving party.  *Id.* at 255.  This generally means "adopting the [non-movant's] version of the facts."  *Coble v. City of White House, Tenn.*, 634 F.3d 865, 868 (6th Cir. 2011) (citing *Scott v. Harris*, 550 U.S. 372, 378 (2007)).  Courts also refrain from resolving credibility disputes on summary judgment.  *Anderson*, 477 U.S. at 255.  There is an exception to this rule where "the non-moving party's version of the events is so blatantly contradicted by *objective evidence* in the record that it fails to create a genuine issue of material fact for trial."  *Coble*, 634 F.3d at 869 (emphasis added).  But otherwise, "if conflicting testimony appears in affidavits and depositions that are filed, summary judgment may be inappropriate as the issues involved will depend on the credibility of the witnesses."

7

*Dawson v. Dorman*, 528 F. App'x 450, 452 (6th Cir. 2013) (citations omitted) .

### B.    Claims Against Unknown Correctional Officers

Federal Rule of Civil Procedure 4(m) states, in pertinent part:

If a defendant is not served within 120 days after the complaint is filed, the court . . . must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period.

As noted above, Hughes filed his complaint on May 5, 2013.  (Doc. # 1).  Therein, he asserts state and federal claims against ten unnamed Correctional Officers who allegedly worked at the CCDC during his period of incarceration.  (*Id.* at 2, ¶ 3).  Pursuant to the Amended Scheduling Order, Hughes had until May 15, 2014 to complete fact discovery.  (Doc. # 17). Although discovery is now complete, he has yet to identify or serve with civil summonses any of the unknown Correctional Officers.  Hughes has not shown good cause, let alone attempted to explain why these defendants have not been served.  Accordingly, all claims asserted against the unnamed Correctional Officers must be **DISMISSED**.  *See Petty v. Cnty. of Franklin*, 478 F.3d 341, 345-46 (6th Cir.2007) (affirming district court's dismissal of John Doe defendants because Plaintiff failed to specifically name the John Doe defendants after the close of discovery).

### C.    Section 1983 Claims Against Nurse Vasser and Nurse Paire

Section 1983 requires a plaintiff to establish the following two elements: (1) the defendant acted under the color of state law; and (2) the defendant's conduct deprived the plaintiff of a federally guaranteed right.  *Handy-Clay v. City of Memphis, Tenn.*, 695 F.3d 531, 539 (6th Cir. 2012).  As medical professionals who rendered services to inmates at a county prison, Nurse Vasser and Nurse Paire qualify as state actors for purposes of §

8

1983.  *See Harrison v. Ash*, 539 F.3d 510, 521 (6th Cir. 2008) (citing *West v. Atkins*, 487 U.S. 42, 56 (1988)).  The remaining question, then, is whether Hughes was deprived of a right secured by federal law.  The right he asserts is that of a prisoner to receive adequate medical treatment during a term of incarceration, which derives from the constitutional prohibition against cruel and unusual punishment.  *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976).

However, the law does not afford relief to every inmate asserting deficient medical care under the Eighth Amendment.  *Id.* at 105.  "In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."  *Id.* at 106.  This standard involves both an objective and subjective component, and each must be satisfied for a plaintiff to succeed on his claim.  *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000) (citing *Farmer v. Brennan,* 511 U.S. 825, 834 (1994)).  The Court will start by addressing the objective component.

## 1.    The Objective Component

To satisfy the objective component, "[an] inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm."  *Id.*  In other words, the inmate must prove that his medical need was "sufficiently serious."  *Id.*  A sufficiently serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008) (citing *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 897 (6th Cir. 2004)).  While dental problems do not automatically satisfy the objective component, the Sixth Circuit does consider dental care to be one of a prisoner's "most important needs."  *McCarthy v. Place*, 313 F. App'x 810,

814 (6th Cir. 2008) (citations omitted).  The seriousness of a dental ailment is determined by factors such as the inmate's level of pain, his ability to engage in normal activities (or lack thereof), and the deterioration of his teeth.  *Id.*

Defendants do not affirmatively argue that Hughes' medical need was insufficient to satisfy the objective component.  Even if they had, such a position would be completely at odds with the facts of this case.  On January 10, 2013, Hughes reported significant pain and difficulty breathing.  He had swelling on his face, neck and chest, and was unable to get out of bed.  As a result of his condition, a deputy "easily recognized" that Hughes was in need of immediate medical attention.  The deputy took him to the main jail, where two nurses and a doctor determined that he should be sent to the hospital.  Hughes underwent emergency surgery the same day and required a full week to recover.  Because it is clear from the objective evidence that Hughes' medical need was sufficiently serious, the Court will proceed to the subjective component of his claim.  It is this component in which Hughes fails.

### 2.      The Subjective Component

The subjective component requires that the defendant act with a "sufficiently culpable state of mind."  *Bargery*, 207 F.3d at 867 (citing *Farmer,* 511 U.S. at 834).  The required mentality is one of "deliberate indifference," which is "something more than mere negligence . . . [but] less than acts or omissions for the very purpose of causing harm or with the knowledge that harm will result."  *Farmer*, 511 U.S. at 835 (citing *Estelle*, 429 U.S. at 104).  A defendant will not be liable under the Eighth Amendment for failing to address a risk that he should have perceived, but did not.  *See Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001) (citing *Farmer*, 511 U.S. at 837).  Rather, a plaintiff must show that the

10

defendant "subjectively perceived facts from which to infer substantial risk . . . that he did in fact draw the inference, and that he then disregarded that risk." *Id.* Thus, deliberate indifference is often equated with reckless disregard. *Farmer*, 511 U.S. at 836. The purpose of this standard is to prevent the constitutionalization of medical malpractice claims. *Comstock*, 273 F.3d at 703.

Hughes contends that Nurse Vasser and Nurse Paire acted with deliberate indifference towards his serious medical needs. (Doc. # 53 at 7-8.) As best the Court can tell, his position is based primarily on the number of days that passed before he was seen by a nurse from SHP. (*Id.*) Hughes counts six days in total, starting on January 4, 2013, the day he completed the first sick call slip, and going through January 10, 2013, the day he was taken by deputies to see Nurse Paire, and ultimately sent to the hospital for surgery. (*Id.*) He does not stop counting a day earlier because, "[a]ccording to [his] version of the facts," only the dentist from Mid America saw him on January 9th. (*Id.*) Hughes also points out that his first sick call slip was "placed as seen" by Nurse Vasser on January 6, 2013, and yet she chose not to examine him on that day or at any point thereafter. (*Id.* at 8).

With respect to Hughes' theory in general, a six day delay in treatment for what was initially described as a "chipped tooth," and thereafter simply called a "bad tooth," is not particularly compelling evidence. Indeed, the Sixth Circuit has declined to find deliberate indifference in circumstances that involved a much longer delay than that alleged by Hughes. *See, e.g., Wright v. Taylor*, 79 F. App'x 829, 831 (6th Cir. 2003) (finding that a five-week delay in treatment for a 'decaying tooth' "[did] not rise to the level of an Eighth Amendment violation because [the plaintiff's] complaint [did] not contain allegations that the

11

defendants consciously chose to disregard the risks to his health.").[5]

Moreover, apart from the relatively brief amount of time that passed before Hughes received treatment, there is simply nothing to suggest that Nurse Vasser or Nurse Paire deliberately ignored a substantial risk to his health. To best demonstrate this second point, the Court will address the allegations against each nurse separately. Because Hughes is the non-moving party, the Court adopts his version of events on summary judgment. *See Coble*, 634 F.3d at 868.[6]

### i.    Nurse Vasser

Although Nurse Vasser signed the first sick call slip as evidence of review on January 6, 2013, she did not examine him on that day or at any point thereafter. Presumably, then, Hughes' theory is that Nurse Vasser was deliberately indifferent because she chose not to provide treatment despite having learned from the sick call slip that he was having problems with his tooth. But because the facts do not show that Nurse Vasser perceived a substantial risk to Hughes' health, she cannot be found liable under the Eighth Amendment.

---

[5] Assuming that the delay in treatment lasted six days is a fairly generous assumption under the circumstances. True, Hughes submitted the first sick call slip on January 4, 2013 and was not seen by a nurse from SHP until January 10, 2013; however, Nurse Vasser most likely did not review the sick call slip until the day she signed it, which was January 6, 2013. Thus, one could just as reasonably argue that Hughes' delay in treatment lasted only four days.

[6] The Court did not hesitate to adopt Hughes' side of the story with respect to Nurse Vasser's involvement. After all, there is no clinical pathway form showing that a visit occurred on January 6th, and Nurse Vasser even testified that she did not recall treating Hughes or scheduling him to see the dentist. The decision with respect to Nurse Paire was not so easy. Nurse Paire states in her affidavit that she saw Hughes on January 9th; Hughes insists otherwise in his deposition. While there is an abundance of documentation to support Nurse Paire's side of the story, *see supra* note 3, the information in those documents was provided by Nurse Paire herself. Because such information does not constitute *objective evidence,* it cannot be used to resolve a credibility dispute on summary judgment. *See Coble*, 634 F.3d at 869. Therefore, the Court adopts Hughes' version of the facts with respect to Nurse Paire as well.

The first sick call slip was Nurse Vasser's only source of information regarding Hughes' condition. All that she learned by reading the slip (assuming she did) was that Hughes had a chipped tooth; that it was painful and showing the nerve; and that he was having difficulty getting sleep. The slip does not suggest that Hughes was suffering from an abscessed tooth or any other serious condition, nor does it describe symptoms that would require immediate care, such as swelling, drainage or difficulty breathing. Moreover, a mere three days passed before Hughes was seen by a dentist from Mid America, at which point Nurse Vasser could safely assume that he was receiving adequate care for a chipped tooth. On these facts, no reasonable juror could find that Nurse Vasser deliberately disregarded a substantial risk to Hughes' health.[7]

Still, one might argue that Nurse Vasser's conduct fell short of the required standard of care. Perhaps a more competent nurse would have examined Hughes immediately in order to rule out the possibility of something more serious than what the sick call slip suggested. But even if this were true, it would not change the outcome here. The case law is clear that arguments based on negligence have no bearing on an Eighth Amendment claim for deliberate indifference. *See Farmer*, 511 U.S. at 838 ("[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for

---

[7] This finding is entirely compatible with the Court's earlier conclusion that Hughes' ailment was objectively sufficiently serious. In assessing the objective component, the Court is free to consider all of the evidence, regardless of timing or whether the defendant had access to a particular item of information. Under the subjective component, however, the Court's goal is to identify which facts the defendant actually perceived, and whether they support the inference that a substantial risk was present. Due to the distinct nature of these inquiries, it is not uncommon for courts to find that a specific defendant was not deliberately indifferent even though the objective component has been satisfied. *See, e.g., Comstock* 273 F.3d at 712 (with respect to Defendant Howell); *Modd v. Cnty. of Ottawa*, Case No. 1:10-CV-337, 2012 WL 5398797, at *16 (W.D. Mich. Aug. 24, 2012) (with respect to Defendant Garvey); *Alcorn v. Scott Cnty. Det. Ctr.*, Case No. CIV.A. 09-232-JBC, 2011 WL 2145287, at *4 (E.D. Ky. May 31, 2011).

commendation, cannot under our cases be condemned as the infliction of punishment."); *Estelle*, 429 U.S. at 106 ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.").

In summary, by Hughes' own account, Nurse Vasser's involvement was limited to reviewing the first sick call slip on January 6, 2013.  That slip did not present evidence of a substantial risk to Hughes' health, and therefore her decision not to examine him after signing it was, at most, negligent.  Because the standard for deliberate indifference requires "a state of mind more blameworthy than negligence," Hughes cannot satisfy the subjective component of his claim against Nurse Vasser.  *Farmer*, 511 U.S. at 835.

### ii.    Nurse Paire

The claim against Nurse Paire is even less convincing.  According to Hughes, his only visit with Nurse Paire occurred on January 10, 2013.  During that encounter, she noted pronounced swelling on his jaw and neck, and observed that he was unable to open his mouth wider than one-half inch.  There is no doubt that Nurse Paire perceived a substantial risk to Hughes' health.  However, after considering his condition, she promptly consulted with her superior and then called Dr. So, who ordered that Hughes be sent to the hospital immediately.  Nurse Paire complied with that order.

Needless to say, these facts do not support any inference that Nurse Paire recklessly disregarded Hughes' serious medical needs.  To the contrary, they show that her conduct was reasonable and competent under the circumstances.  Because Hughes cannot demonstrate deliberate indifference, his claim against Nurse Paire fails as well.  *See Farmer*, 511 U.S. at 845 ("Whether one puts it in terms of duty or deliberate indifference,

prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause.").

### D.    Remaining Claims

The amended complaint includes a similar § 1983 claim against SHP as an entity. It also includes state law claims against all defendants for negligence and failure to comply with 501 KAR 3:090.  Defendants have put forth convincing arguments in favor of summary judgment with respect to each of these claims.  They contend that the federal claim against SHP cannot proceed because there is no evidence of a corporate policy that deprived Hughes of his constitutional rights.[8]  (Doc. # 50-1 at 13-14).  They also explain that the negligence claims are time-barred and unsupported by expert proof, while noting that the regulatory claim fails for lack of evidence.  (*Id.* at 15-20).  Hughes does not address any of these arguments in his Response.  Instead, he concedes that "there is no federal action against Southern Health Partners and that the state law claims are time barred."  (Doc. # 53 at 1).

As discussed *supra*, once a moving party files a properly supported motion for summary judgment, the non-movant's burden is to cite to evidence upon which a reasonable jury could return a verdict in his favor.  *Anderson*, 477 U.S. at 248-52.  Since Hughes has clearly failed to meet this burden, the Court will grant summary judgment for Defendants on all remaining claims.

---

[8] The claim against SHP also fails because a plaintiff cannot proceed against a corporate entity under § 1983 without showing an actual violation of his constitutional rights.  *Modd v. Cnty. of Ottawa*, Case No. 1:10-cv-337, 2012 WL 5398797, at *18 (W.D. Mich. Aug. 24, 2012) (citing *Bowman v. Corrections Corp. of America*, 350 F.3d 537, 546 (6th Cir. 2003)).  Based on the Court's finding with respect to Nurse Vasser and Nurse Paire, Hughes cannot make this showing.

## IV.     Conclusion

Accordingly, for the reasons stated herein,

**IT IS ORDERED** as follows:

(1)     Defendants' Motion for Summary Judgment (Doc. # 50) be, and is hereby, **GRANTED** in full;

(2)     Hughes' federal and state law claims are hereby **DISMISSED WITH PREJUDICE**;

(3)     This case is hereby **STRICKEN** from Court's active docket; and

(4)     A Judgment shall be entered contemporaneously herewith.

This 11th day of June, 2015.



Signed By:
David L. Bunning
United States District Judge

G:\DATA\Opinions\Covington\2013\13-49 MOO Granting MSJ.wpd